FLASTER/GREENBERG P.C.
By:      Jeffrey A. Cohen, Esquire
Attorney ID No. 69224
Jeffrey.Cohen@flastergreenberg.com
1810 Chapel Avenue West
Cherry Hill, NJ 08002
*Attorneys for Drummond Decatur and State Properties, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DRUMMOND DECATUR AND STATE PROPERTIES, LLC | Civil Action No.: 2:14-cv-04821-AB |
| *Plaintiff,* | |
| V. | |
| MATERIALS PROCESSING, LLC, SK INTERNATIONAL, INC., TRACE TM L.L.C., DAVID KUTOFF, JOHN DOES 1-99, and ABC CORPORATIONS #1-99 | |
| *Defendants.* | |

## SECOND AMENDED COMPLAINT

Plaintiff Drummond Decatur and State Properties, LLC (hereinafter, "Landlord" or

"Plaintiff"), by way of this Second Amended Complaint[1] against Defendants Materials

Processing, LLC (formerly Materials Processing Corporation) (hereinafter, "MPC" or "Tenant"),

---

[1] Plaintiff amends its First Amended Complaint as a matter of course pursuant to Rule 15(a)(1)(B) of the Rules of Civil Procedure. *See also Mackereth v. Kooma, Inc.*, 2015 WL 2337273, at *12 (E.D. Pa. May 14, 2015) ("Plaintiffs were entitled to amend their amended complaint once "as a matter of course" within twenty-one days after service of a motion to dismiss."). However, in the event that this Court finds that Plaintiff does not have the right to amend its First Amended Complaint as a matter of course, Plaintiff respectfully requests that this Court grant it leave to amend its First Amended Complaint pursuant to Fed. R. Civ. Pro. 15(a), which states that leave to amend shall be freely given when justice so requires. By amending its First Amended Complaint, Plaintiff seeks to address the alleged deficiencies in its pleading, including, but not limited to, factual allegations relating to Kutoff's continuous and systemic contacts with the jurisdiction (*see, e.g., infra* ¶¶ 28-30, for example) and to the Defendants' abuse of the corporate form (*see, e.g., infra* ¶¶58-66). Defendants would not be prejudiced by an amendment and Plaintiff has made this request without any undue delay and in good faith. Permitting this amendment would ensure that this case will be decided on its merits rather than on technicalities. *Masimo Corp. v. Philips Electronics North America Corp.*, 2010 WL 1609899, at *1 (D. Del. Apr. 20, 2010) (internal quotation omitted).

SK International, Inc. ("SK"), David Kutoff ("Kutoff"), John Does #1-99, and ABC
Corporations #1-99 (collectively, "Defendants") in this matter, states as follows:

1.      This was originally an action for breach of a commercial, eight-year and two
month lease agreement against MPC, where jurisdiction is founded upon diversity.

2.      As a result of the filing of litigation, it has been revealed that Defendants have
engaged in a concerted effort to defraud the Plaintiff, and Plaintiff hereby amends its complaint
to pierce the corporate veil against MPC, in order to additionally recover its damages from SK
and Kutoff, and potential unknown Defendants.

3.      Materials Processing Corporation signed a lease agreement with Plaintiff's
predecessor-in-interest, 10551 Decatur Road Partners, L.P. ("10551") on October 1, 2010 (the
"Original Lease").  The Original Lease was amended by "Amendment No.1" dated June 14,
2011 (the "Lease Amendment") (the Original Lease, as amended by the Lease Amendment, is
hereinafter referred to as the "Lease").  MPC agreed to pay "minimum rent" (hereinafter,
"Minimum Rent"), along with "additional rent" (hereinafter, "Additional Rent"), in accordance
with the terms of the Lease, for a term of eight (8) years and two (2) months beginning on
October 1, 2010.  10551 assigned all of its rights under the Lease to Plaintiff on or about October
2012 in connection with the sale of the Property (as defined below).  As of the June 2014 rental
period, MPC ceased paying Minimum Rent.  As of the July 2014 rental period, MPC ceased
paying Minimum Rent and Additional Rent (collectively, "Rent").  Prior to that, dating back to
January 2013, MPC failed to pay the full amounts due and owing for Additional Rent as defined
by the Lease.

4.      During this litigation, Plaintiff demanded information from MPC related to any
environmental issues in connection with the Property, as Plaintiff was entitled to know pursuant
to the Lease.  At the direction and control of Kutoff, MPC repeatedly stalled and eventually
disingenuously represented that it had little to no information.  On May 13, 2015, counsel for

2

MPC represented that "it was not until yesterday that [we were] able to assemble sufficient information for a management discussion on the issue." MPC's representation, as directed by Kutoff, was knowingly false, as revealed by a letter from Chubb Insurance Companies ("Chubb") which pointed out that MPC hired Integrated Loss Control to perform an industrial hygiene investigation at the Property on April 22, 2014. Chubb stated that a final report was provided to MPC on May 29, 2014, a full year before the May 13, 2015 representation that MPC did not have sufficient information. Furthermore, the May 29, 2014 report revealed "lead contamination at the Site."

5.      In addition, MPC, through its counsel and at the direction/control of Kutoff, repeatedly represented to Plaintiff that MPC had appropriate insurance coverage for any such lead contamination. MPC, at the direction/control of Kutoff, made fraudulent representations that MPC was working with its carrier to ensure any cleanup at the Property would be paid by MPC. In fact, MPC and Kutoff were aware that Chubb denied coverage for the lead contamination on the basis that MPC did not have coverage for this Property at the time of contamination. Instead, MPC tried, and failed, to add applicable coverage more than six months after it already had a report in hand detailing lead contamination.

6.      Plaintiff seeks damages for unpaid Rent in excess of $100,000.00 from Defendants (MPC, directly, and other Defendants by piercing the corporate veil), cleanup of undisclosed lead contamination, physical damage to the Property, late payment charges and interest pursuant to the Lease, as well as other compensatory damages, punitive damages for fraud, and such other relief as is just and proper.

## PARTIES

7.      Plaintiff is a limited liability company, organized pursuant to the laws of Delaware, with its principal place of business located at 8228 Abingdon Road, Kew Gardens, New York, NY 11415.

3

8.      MPC, a Minnesota limited liability company with an office located at 2300 Pilot Knob Road, Mendota Heights, MN 55120, conducted business in the Commonwealth of Pennsylvania on the Property it rented from Plaintiff.  Kutoff is the President and Chief Executive Officer of MPC, and SK is its sole shareholder.

9.      SK, a Minnesota corporation also located at 2300 Pilot Knob Road, Mendota Heights, MN 55120, conducted business in the Commonwealth of Pennsylvania.  SK is the sole shareholder of MPC and, upon information and belief, is controlled and operated by Kutoff, its Chief Executive Officer and Director.

10.     Kutoff is an individual and resident of Minnesota, owning and controlling the aforementioned Defendant businesses.  Kutoff availed himself to this jurisdiction by conducting business in the Commonwealth of Pennsylvania, and committing the alleged acts in the Commonwealth of Pennsylvania.

11.     MPC and SK are both, directly and/or indirectly, owned, operated and/or controlled, by Kutoff, and all Defendants availed themselves to this jurisdiction by their actions and business operations in this jurisdiction.

## JURISDICTION & VENUE

12.     This Court has diversity jurisdiction over all claims pursuant to 28 U.S.C. §1332 as the matter in controversy is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interests.

13.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391(b) because all or a substantial part of the events giving rise to Plaintiff's claim in this matter occurred in this District, including, but not limited to, the tenancy in question.

4

5482722 v1

## STATEMENT OF THE FACTS

### The Lease Agreement

14.     On or about October 1, 2010, 10551 and Tenant entered into the Original Lease.
The Original Lease was made effective as of October 1, 2010 and had an initial term of eight (8)
years plus two (2) months, ending on November 30, 2018.  Upon expiration of the initial term,
and in accordance with Section 4 of the Original Lease, the Lease may be extended for one
additional five (5) year period commencing on the day following the "Expiration Date" (as
defined in the Lease) and expiring five (5) years thereafter.  A copy of the Original Lease is
attached hereto as **Exhibit A** and incorporated herein.

15.     The Original Lease was executed by Kutoff on behalf of MPC and directed that
all mailings, notices, or demands pertaining to the Original Lease be sent to Kutoff's attention.

16.     The Original Lease was amended by the Lease Amendment.  The Lease
Amendment is attached hereto and incorporated herein as **Exhibit B**.

17.     Pursuant to the Lease Amendment, the parties confirmed certain additional office
space and additional warehouse space the Tenant would lease effective as of June 14, 2011.  **See
Exhibit B.**

18.     The Lease Amendment also adjusted the monthly Minimum Rent due (as defined
in the lease) by Tenant, and the Tenant's proportionate share of "Operating Expenses" (as
defined in the Lease), so as to reflect the additional space being leased by the Tenant, effective as
of June 2011.  **See Exhibit B**.

19.     Pursuant to the Original Lease, as amended by the Lease Amendment, Tenant
currently leases approximately 118,176 square feet of space including certain premises known as
the "Main Warehouse Square", the  "Office Space", the "Additional Warehouse" space and the
"Additional Office Space" (hereinafter collectively, the "Premises") in the commercial building

5482722 v1

situated at 10551 Decatur Road, Philadelphia, Pennsylvania 19154 (the "Property").  **See Exhibits A & B.**

20.     Pursuant to the Lease, Tenant occupies the Premises for the purpose of operating its business.  **See Exhibit A.**

21.     The Lease requires, among other things, Tenant to occupy the Premises and to pay Minimum Rent on a monthly basis.  **See Exhibit A.**

22.     The Lease provides for payment of monthly Minimum Rent, which is due and payable on the first of each month, and which increases incrementally over the term of the Lease, up to a maximum Minimum Rent amount of $38,801.12 per month.  **See Exhibits A & B.**

23.     The Lease also provides for payment of Additional Rent, including, but not limited to, payment of Tenant's proportional share of Operating Expenses, within thirty days of a receipt of a statement of such from the Landlord.  **See Exhibit A.**

24.     The Lease provides that Tenant shall have an option to renew ("Renewal Option") and extend the lease for one (1) additional period of five (5) years, commencing on the day following the Expiration Date and expiring five (5) years thereafter.  **See Exhibit A.**

25.     The Renewal Option may only be exercised by Tenant by giving written notice thereof no more than twelve (12) months prior to the Expiration Date.  **See Exhibit A.**

26.     Landlord took assignment of the Lease on or about October 2012 in connection with its purchase of the Property.

27.     In connection with the purchase of the Property, Landlord took a mortgage loan from Basis Real Estate Capital, II.  Defendant is identified as an "Anchor Tenant" in the documents evidencing such loan, which were executed by Kutoff.  As such, Landlord is required to maintain and fund an "Anchor Tenant Reserve Fund" upon the occurrence of an event of default by Tenant under the Lease.

5482722 v1

Kutoff's Continued Involvement with the Property and the Lease Agreement

28.     At all times, Kutoff actively controlled and directed the business operations on the Property and repeatedly visited the Property in order to effectively do so.

29.     After executing the Lease, Kutoff remained actively involved in discussions pertaining to the Lease Agreement, corresponding with Plaintiff on issues relating to necessary building repairs, late payments of any monies owed to Plaintiff, and re-negotiations of key terms of the Original Lease, as well as making representations about MPC's operations to Plaintiff.

30.     On several occasions, Kutoff also requested that Plaintiff meet with him in person during one of his numerous visits to the Property.

Breach of the Lease

31.     At the direction and control of Kutoff, MPC failed to pay the Minimum Rent due under the Lease for the months of June, July and August, 2014.

32.     Tenant has failed to pay the full amount of Additional Rent due under the terms of the Lease since January, 2013.

33.     The final payment received by Landlord from Tenant was marked check number 45237, dated May 30, 2014 and in the amount of $13,437.79.

34.     In accordance with the terms of the Lease, by letters dated June 11, 2014, June 24, 2014 and July 11, 2014, Landlord, through the undersigned counsel, notified Tenant of its default under the Lease for the failure to pay Rent.  Copies of such default notices are attached hereto as **Exhibit C**.

35.     The default notice was sent to Kutoff, with a copy to Timothy Welch, Esquire of Leonard Street and Deinard via Certified Mail, Return Receipt Requested, as required under the Lease.

36.     Tenant failed to cure said defaults within the notice and cure periods provided in the Lease.

7

37.     At the direction and control of Kutoff, Tenant continued to occupy the Premises and intentionally refused to pay the Rent or other amounts owed to the Landlord; thereby getting the benefit of the Property and continuing its operations.

38.     Despite Tenant's receipt of the default notices, Tenant has failed to pay the Minimum Rent due and owing under the Lease, and said failure constitutes an "Event of Default" under the Lease.

39.     Despite Tenant's receipt of the default notices, Tenant has failed to pay the Additional Rent due and owing under the Lease, and said failure constitutes an "Event of Default" under the Lease.

40.     Plaintiff seeks to recover in excess of $100,000 (for unpaid Rent through August 30, 2014), in addition to an amount to be determined for the remaining 51 months (September 1, 2014 through November 30, 2018) of Rent due under the Lease, pursuant to Section 18 of the Lease, which allows for the acceleration of the entire balance of unpaid rent for the remaining term of the Lease.

41.     Plaintiff also seeks to recover money damages from Tenant pursuant to Section 21 of the Lease, for the costs and expenses incurred by Landlord in re-letting the Premises including, without limitation, the costs for making all repairs, alterations and improvements reasonably required to be made, as well as for performing all covenants of Tenant relating to the condition of the Premises during the Term, in an amount to be determined, together with reasonable attorneys' fees and other reasonable costs, also in an amount to be determined.

<u>MPC's Fraudulent Concealment of Lead Contamination</u>

42.     In the past year, Plaintiff has repeatedly demanded information from MPC related to any environmental issues in connection with the Property.  Kutoff, who directs and controls MPC, was included in all such communications.

8

43.     Kutoff, MPC, and its officers and directors, have intentionally stalled, withheld critical information and represented that they were still gathering information about the Property, including in representations made before a federal court.

44.     On May 13, 2015, MPC, through its counsel, knowingly, intentionally, and/or maliciously misrepresented that "it was not until yesterday that [we were] able to assemble sufficient information for a management discussion on the issue." A copy of the May 13, 2015 email is attached hereto as **Exhibit D**.

45.     Upon information and belief, Kutoff participated in, directed, and/or orchestrated the misrepresentations told to Plaintiff through MPC's counsel.

46.     MPC's representations were knowingly false, as revealed by a letter from Chubb, which pointed out that MPC hired Integrated Loss Control to perform an industrial hygiene investigation at the Property on April 22, 2014. A copy of the June 8, 2015 letter is attached hereto as **Exhibit E**.

47.     Chubb stated that a final report was provided to MPC on May 29, 2014, a full year before the May 13, 2015 intentional misrepresentation that MPC did not have sufficient information, providing that there was "lead contamination at the Site." **See Exhibit E**.

48.     Plaintiff relied on the fraudulent misrepresentations of Defendants that they were unaware of any lead contamination at the property, and as a result, Plaintiff was not able to begin remediating the Property to prepare it to relet, or otherwise utilize, for a substantial period of time beyond the date when the lead contamination was discovered and disclosed.

49.     As a result of Defendants' fraudulent concealment and misrepresentations, Plaintiff has suffered damages because of the costs of having to clean up the lead contamination at the Property, in addition to damages for being unable to lease or the sell the Property to anyone else until the cleanup is performed.

5482722 v1

MPC's Fraudulent Misrepresentation Regarding Coverage for Environmental Pollution

50.     In addition, Defendants, their officers, directors, and counsel, intentionally, knowingly, and/or maliciously misrepresented to Plaintiff, in the past year, that MPC had appropriate insurance coverage for any such lead contamination.

51.     Defendants, including specifically Kutoff, made fraudulent representations that MPC was working with its insurance carrier, Chubb, to ensure any cleanup at the Property would be paid by MPC and its insurers.

52.     In actuality, Defendants tried, and failed, to add applicable coverage more than six months after it already had the May 29, 2014 report in hand detailing lead contamination.

53.     Defendants, at the direction and control of Kutoff, did not disclose this failure to procure applicable coverage in a timely fashion.

54.     Instead, Defendants, at the direction and control of Kutoff, and their officers and directors, intentionally, knowingly, and/or maliciously concealed this information from the Plaintiff.

55.     In fact, Defendants, including Kutoff, were aware that Chubb denied coverage for the lead contamination on the basis that MPC did not have coverage for this Property at the time of contamination.

56.     Plaintiff relied on the fraudulent misrepresentations of Defendants that they had applicable insurance coverage for the damage, would work to clean the Property once it was allegedly discovered and would pay the costs to remediate the Property, and as a result, Plaintiff was not able to begin remediating the Property to prepare it to relet, or otherwise utilize, for a substantial period of time beyond the date when the lead contamination was discovered and disclosed.

57.     As a result of Defendants' fraudulent misrepresentations, Plaintiff has suffered damages because of the costs of having to clean up the lead contamination at the Property, in

10

addition to damages for being unable to lease or the sell the Property to anyone else until the cleanup is performed.

### Defendants' Alter Egos and Intermingling

58.     Plaintiff repeats each of the allegations set forth in the foregoing paragraphs of this Second Amended Complaint as if set forth at length herein.

59.     At all times relevant to the instant action, Kutoff actively owned, operated and/or controlled MPC and SK.

60.     SK, which is controlled by Kutoff, was the sole shareholder of MPC when MPC was incorporated as "Materials Processing Corporation," and it is now the sole member of MPC, currently set up as "Materials Processing, LLC."

61.     Upon information and belief, MPC and SK have non-functioning officers and directors and are solely controlled by Kutoff.  MPC, therefore, was merely a façade for the operations of the other defendants.

62.     Upon information and belief, Defendants have improperly intermingled their funds, hidden assets from Plaintiff, and siphoned funds from MPC.

63.     MPC sold certain assets to Dynamic Recycling, Inc., a Wisconsin Corporation, pursuant to an asset purchase agreement, executed on August 12, 2015, and failed to disclose the sale to Plaintiff.  Defendants have stripped MPC of its assets in order to avoid creditors like Plaintiff.   As such, MPC's corporate form was used by the Defendants to perpetuate fraud.

64.     Upon information and belief, MPC improperly and fraudulently diverted assets to Defendants to evade having to pay Plaintiff its continually increasing damages and to clean the Property, as well as to evade a default judgment in this pending action.  Defendants, in turn, personally benefited from said diversion.

65.     Accordingly, Defendants are alter egos of each other and MPC's corporate identity should be disregarded in order to prevent a grave injustice.

11

5482722 v1

66.     Plaintiff is entitled to pierce the corporate veil due to Defendants' fraud in order to recover compensatory, consequential, and punitive damages.

## FIRST COUNT—BREACH OF CONTRACT
### (As to all Defendants under the Veil-Piercing Theory and as to MPC)

67.     Plaintiff repeats each of the allegations set forth in the foregoing paragraphs of this Complaint as if set forth at length herein.

68.     By engaging in the above-described conduct and failing to pay the Rent due and owing under the Lease, Tenant breached the Lease.

69.     Under the terms of Section 18 of the Lease, Landlord has the right to accelerate the rent due under the Lease, at the rate provided in the Lease.

70.     Under the terms of Section 21 of the Lease, Landlord has the right to recover its costs and expenses incurred in re-letting the Premises including, without limitation, the costs for making all repairs, alterations and improvements reasonably required to be made, as well as for performing all covenants of Tenant relating to the condition of the Premises during the Term, together with reasonable attorneys' fees and other reasonable costs.

71.     Defendants also breached the Lease by damaging the Property, including the parking area, air conditioning system and roof.

72.     Landlord has been damaged as a result of Tenant's breaches of the Lease, before the end of the Term, and seeks as its damages the amount of the unpaid Rent currently due and owing under the Lease, along with the amount of the accelerated Rent due under the Lease for the remainder of the term, according to the terms of the Lease, for damages to the Property, and along with its costs and expenses incurred as a result of Tenant's default including, but not limited to, Landlord's court costs and reasonable attorneys' fees, costs for repair of the property, and restoration and re-letting expenses.

12

WHEREFORE, Plaintiff requests judgment against Defendants for all compensatory damages allowed under the Lease, as well as costs of suit, attorneys' fees, interest, and such other relief that this Court may deem appropriate.

## SECOND COUNT—FRAUD
### (As to all Defendants under the Veil-Piercing Theory and as to MPC and Kutoff)

73.    Plaintiff repeats each of the allegations set forth in the foregoing paragraphs of this Complaint as if set forth at length herein.

74.    By engaging in the above-described conduct, Defendants made material misrepresentations regarding the existence of lead contamination at the Property, as well as their knowledge of this condition, and whether such contamination was covered by their insurance policy.

75.    Upon information and belief, as the controlling corporate officer who participated in and directed the fraud, Kutoff is jointly liable for MPC's misrepresentations.

76.    Defendants made these misrepresentations knowingly, intentionally, and/or maliciously with knowledge of their falsity.

77.    Defendants made these misrepresentations with the intent that Plaintiff would rely upon them.

78.    Plaintiff justifiably relied on Defendants' misrepresentations.

79.    As a result, Plaintiff suffered damages.

WHEREFORE, Plaintiff requests judgment against Defendants for all compensatory damages allowed under the Lease, as well as costs of suit, attorneys' fees, interest, punitive damages, and such other relief that this Court may deem appropriate.

By: FLASTER/GREENBERG P.C.

Dated: February 1, 2016                    _/s/ Jeffrey A. Cohen_____
                                            Jeffrey A. Cohen
                                            _Attorneys for Plaintiff_

13

5482722 v1

## VERIFICATION

I, Jeffrey A. Cohen , hereby verify that I am authorized to make this verification on behalf of Plaintiff and that the facts set forth in the foregoing pleading are true and correct to the best of my knowledge, information and belief.  I understand that false statements are subject to the penalties of 18 P.S. § 4904 relating to unsworn falsifications to authorities.


_/s/ Jeffrey A. Cohen_
Jeffrey A. Cohen

Dated: February 1, 2016

14

5482722 v1

# EXHIBIT A

## LEASE AGREEMENT

This LEASE AGREEMENT (this "*Lease*"), is made and entered into this   day of October 1, 2010, by and between 10551 Decatur Road Partners, LP, with an office located at P.O. Box 423, Brooklyn, NY 11222 ("Owner"), and Materials Processing Corporation, a Minnesota corporation, with an office located at 2300 Pilot Knob Road, Mendota Heights, MN 55120 ("*Tenant*").

WITNESSETH: That in consideration of the mutual covenants and agreements herein contained, it is agreed by and between Owner and Tenant as follows:

b.      PREMISES: Owner hereby Leases to Tenant and Tenant hereby Leases from Owner approximately 111,776 square feet (including 59,510 square feet of warehouse space (the "*Main Warehouse Space*"), 2,500 square feet of office space (the "*Office Space*"), and 49,766 square feet of additional warehouse space (the "*Additional Warehouse Space*")) (collectively, the "*Premises*") in the commercial building situated at 10551 Decatur Road, Philadelphia, Pennsylvania (the "Building"), depicted on the site plan attached hereto as Exhibit A (the "*Site Plan*") and located on the real property legally described on Exhibit B, together with the use of all common areas, adjacent parking and loading areas, and ingress and egress therefrom, all as depicted on the Site Plan. In addition, the Site Plan shall identify the Main Warehouse Space, the Office Space and the Additional Warehouse Space.

2.      TERM. The initial term of this Lease shall be for a period of eight (8) years and (2) two months (the "*Initial Term*") and Tenant's obligation to pay rent hereunder shall commence on October 1, 2010 (the "*Commencement Date*"), and shall continue until November 30, 2018 (the "*Expiration Date*"), unless sooner terminated pursuant to the terms and conditions of this Lease. Following the expiration of the Initial Term, and so long as Tenant is not in Default (as defined herein) under this Lease, Tenant shall have the option to extend this Lease in accordance with Section 4 below. As used herein, "*Term*" shall mean the Initial Term of this Lease, as it may be extended and renewed by the Extended Term (as defined below).

3.      MINIMUM RENT: Owner and Tenant hereby mutually agree to the following terms, conditions, and rental payment schedule and further agree that the minimum rental (the "Minimum Rent") for the Premises shall be payable to Owner on the first day of each month without prior notice or demand according to the schedule on the following page:

7/0484549

Initials: _____

| Term | Minimum Rent per square foot per year | Monthly Minimum Rent: Main Warehouse Space and Office Space | Monthly Minimum Rent: Additional Warehouse Space | Total Monthly Minimum Rent (assuming that lease of Additional Warehouse Space is not terminated) |
|---|---|---|---|---|
| October 1, 2010 thru November 30, 2011 | $0.00 | $0.00 | $0.00 | $0.00 |
| December 1, 2011 thru November 30, 2012 | $3.00 | $15,502.50 | $12,441.50 | $27,944.00 |
| December 1, 2012 thru November 30, 2013 | $3.25 | $16,794.38 | $13,478.29 | $30,272.67 |
| December 1, 2013 thru November 30, 2014 | $3.50 | $18,086.25 | $14,575.08 | $32,661.33 |
| December 1, 2014 thru November 30, 2015 | $3.61 | $18,654.68 | 14,971.27 | $33,625.95 |
| December 1, 2015 thru November 30, 2016 | $3.72 | $19,223.10 | $15,427.46 | $34,650.56 |
| December 1, 2016 thru November 30, 2017 | $3.83 | $19,791.53 | $15,883.65 | $35,675.17 |
| December 1, 2017 thru November 30, 2018 | $3.94 | $20,359.95 | $16,339.84 | $36,699.79 |

Anything herein to the contrary notwithstanding, provided Tenant is not in default under any of the covenants of this Lease beyond the applicable grace period provided in this Lease for the curing of such defaults, the Minimum Rent from October 1, 2010 until November 30, 2011 shall be $0.00 and further provided that if Owner has not substantially completed the items of Owner's Work, defined below marked on **Exhibit C** with a "*" by January 1, 2010, and delivered the Use and Occupancy Permit required under Section 7F below, the Minimum Rent of $0.00 shall be extended beyond November 30, 2011 for a number of days equal to the number of days beyond January 1, 2010 that it takes Owner to substantially complete Owner's Work and deliver the Use and Occupancy Permit. It is the understanding of the parties hereto that the Term of the Lease and Minimum Rent calculations shall be measured from the Commencement Date, such Term and calculations as set forth herein being based upon a October 1, 2010 Commencement Date.

Anything herein to the contrary notwithstanding, in the event Owner has not completed the construction as per **Exhibit C** (*"Owner's Work"*) by January 1, 2011, then Tenant may complete Owner's Work, and Tenant shall deliver to Owner receipts specifying all reasonable out-of-pocket costs and expenses incurred by Tenant to complete Owner's Work and Owner shall reimburse Tenant for such costs and expenses within ten (10) business days after the receipt of such receipts together with such supporting documentation as Owner may reasonably request.

2

7104845-9

Initials: _____

4.    RENEWAL OPTION.  Tenant shall have an option (the "*Renewal Option*") to renew and extend the term of this Lease for one (1) additional period of five (5) years (the "*Extended Term*"), commencing on the day following the Expiration Date and expiring five (5) years thereafter, unless the applicable Extended Term shall sooner terminate pursuant to any of the terms of the Lease or otherwise.  The Renewal Option may only be exercised by Tenant giving written notice thereof no more than twelve (12) months prior to the Expiration Date.  If Tenant fails to give notice of exercise of the Renewal Option within such specified time period, the Renewal Option shall be deemed waived and of no further force and effect, and the Lease shall expire on the Expiration Date.

If Tenant shall exercise the Renewal Option (in accordance with and subject to the provisions of this Section 4), all of the terms, covenants and conditions provided in this Lease shall continue to apply during the Extended Term, except that (i) the Minimum Rent rate payable by Tenant during the Extended Term shall be equal to the greater of (a) the then Prevailing Market Rate (as defined herein) for the Premises, or (b) the Minimum Rent payable for the month prior to the Extended Term, and (ii) any terms, covenants and conditions that are expressly or by their nature inapplicable to such Extended Term (including, without limitation, this Section 4) shall be deemed void and of no further force and effect.

Within thirty (30) days following Tenant's exercise of the Renewal Option, Owner shall provide Tenant written notice of its good faith determination of the Prevailing Market Rate for the Extended Term.  Within ten (10) business days after receipt of Owner's determination, Tenant shall notify Owner in writing that Tenant either (i) accepts Owner's determination of the Prevailing Market Rate for the Extended Term, (ii) revokes its exercise of such Renewal Option in which event this Lease shall terminate the end of the Initial Term, or (iii) rejects Owner's determination of the Prevailing Market Rate for the Extended Term.  If Tenant fails to give timely written notice to Owner of its decision, then Tenant shall conclusively be deemed  to have revoked its exercise of such Renewal Option in which event this Lease shall terminate at the end of the Initial Term.  If Tenant timely accepts or rejects Owner's determination of the Prevailing Market Rate for the Extended Term, then Tenant shall not thereafter be entitled to revoke its exercise of the applicable Renewal Option.  If Tenant so rejects Owner's determination, Owner and Tenant shall endeavor to reach agreement upon the Prevailing Market Rate for the applicable Extended Term within thirty (30) days from the date of Tenant's notice to Owner.  In the event that Owner and Tenant are unable to agree on the Prevailing Market Rate within said thirty (30) days after the date of Tenant's notice to Owner of its intention to exercise the Renewal Option, then the Prevailing Market Rate shall be determined in accordance with the terms of this section.  Within ten (10) days after the expiration of the aforesaid thirty (30) day negotiation period between Owner and Tenant, Owner and Tenant, at each party's own expense, shall each appoint one Arbitrator (as hereinafter defined) and each party shall provide its respective Arbitrator with a proposal setting forth its determination of the Prevailing Market Rate together with

3

Initials: _____  ____

_____

such information on comparable rentals and such other evidence as such party shall deem relevant. If either party fails to timely select an Arbitrator, then the other party may appoint a second Arbitrator prior to the time the untimely party selects an Arbitrator, on behalf of the untimely party, at such untimely party's expense. The two appointed Arbitrators shall then have fifteen (15) days after the appointment of the second Arbitrator in which to determine whether the Owner's or the Tenant's proposed Prevailing Market Rate should be utilized. In the event that the two Arbitrators are unable to agree on either the Owner's or the Tenant's proposal within such fifteen (15) day period, then such Arbitrators shall select a third Arbitrator within five (5) days after the expiration of such fifteen (15) day period. The cost of such third Arbitrator shall be shared equally by Owner and Tenant. If the three Arbitrators, within fifteen (15) days thereafter, cannot unanimously agree upon either the Owner's or the Tenant's proposed Prevailing Market Rate, then each of the three Arbitrators shall select one of the two proposals and the selection of either the Owner's proposal or the Tenant's proposal by any two of the three Arbitrators shall be final and conclusive for all purposes in determining the Prevailing Market Rate. The parties understand, stipulate and agree that there will be no compromise, modification or averaging of the Owner's and Tenant's proposals for the Prevailing Market Rate and the Arbitrators must select one or the other, and that the proposed Prevailing Market Rate selected by the foregoing arbitration procedure shall be final, binding, conclusive and effective on Owner and Tenant for purposes under this Lease, and same shall not be subject to judicial review, mediation or any other legal proceeding. As used herein, the term *"Arbitrator"* shall mean (i) a licensed real estate broker with at least fifteen (15) years of continuous experience in industrial leasing transactions in Philadelphia, Pennsylvania, and (ii) a person that has not represented either Owner or Tenant during the five (5) years preceding the Commencement Date.

The *"Prevailing Market Rate"* shall be determined based on rates charged to tenants for space of comparable size, location and conditions in comparable buildings in Philadelphia, Pennsylvania and further taking into consideration the following: (i) the location, quality and age of the building, (ii) the extent of leasehold improvements (to be provided), (iii) tenant improvement allowances, (iv) abatements (including with respect to base rental, operating expenses and real estate taxes and parking charges), (v) any other adjustments (including by way of indexes) to base rental, (vi) extent of services provided or to be provided, (vii) term or length of lease, (viii) the payment of a leasing commission and/or fees/bonuses in lieu thereof, whether to Owner, any person or entity affiliated with Owner, or otherwise, (ix) any other concession or inducement or condition in making the Prevailing Market Rate determination, (x) the financial condition and general creditworthiness of the tenant, (xi) the time the particular rental rate under consideration became or is to become effective, and (xii) all other relevant factors.

Notwithstanding anything herein to the contrary, in no event shall Minimum Rent during the Extended Term be less than the amount of $36,699.79 per month for the Main Warehouse Space and

4

710484549

Initials: _____

Office Space and the Additional Warehouse Space, provided that if Tenant terminates its use of the Additional Warehouse Space under Section 5a below, the Minimum Rent during the Extended Term shall not be less than $20,359.95.

5.    TERMINATION RIGHTS:

a.    Tenant shall have right to terminate its lease of the "*Additional Warehouse* Space" on June 30, 2011, by giving Owner notice thereof in writing on or before June 29, 2011. If Owner does not receive written notice of Tenant's intent to terminate its Lease of the *Additional Warehouse Space* by such date, Tenant will be deemed to have waived its right to terminate its Lease of the *Additional Warehouse Space* under this Section 5A.

b.    Tenant shall have the right to terminate this Lease effective as of November 30, 2015 by (a) giving written notice to Owner by, on or before December 1, 2014, of its intent to terminate the Lease and (b) with such notice paying to Owner a termination fee equal to the Minimum Rent for the four (4) months immediately prior to the delivery of the written termination notice. If Owner does not receive the written termination notice and termination fee set forth in the previous sentence on or before December 1, 2014, Tenant shall be deemed to have waived its right to terminate the Lease under this Section 5B.

6.    ADDITIONAL RENT: Tenant shall pay its proportionate share, defined below, of *Operating Expenses*, defined below ("*Additional Rent*") and such Additional Rent shall be paid when due in accordance with the terms of this Lease, without any abatement, set-off, deduction or counterclaim. Unless otherwise provided in this Lease, Tenant shall pay Additional Rent to Owner within thirty (30) days after a statement from Owner is delivered to Tenant setting forth the amount of Additional Rent that is due. If Tenant shall fail to pay any Additional Rent when the same shall be due and payable in accordance with the terms hereof, Owner shall have all rights, powers and remedies with respect thereto as provided herein or by law in the case of nonpayment of any rent.

a.    Survival of Obligation: Tenant's obligation to pay Minimum Rent and Additional Rent (collectively, "*Rent*") as provided in this Lease shall survive the expiration or earlier termination of this Lease.

b.    Payment of Lesser Amount: No payment by Tenant or receipt or acceptance by Owner of a lesser amount than the correct amount of any Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment without prejudice to Owner's right to recover the balance or pursue any other remedy in this Lease or at law.

5

710x945v0

Initials: _____

7.    MAINTENANCE REPAIR AND REPLACEMENT; OPERATING EXPENSES:

A.    The parties agree that during the Term of this Lease, Owner shall be solely responsible for all costs associated with the repair, replacement and maintenance of the roof, parking lot, HVAC systems, and structural elements and exterior of the Building, provided such repair, replacement and maintenance was not caused by or resulting from the carelessness, omission, neglect or improper conduct of Tenant, Tenant's servants, employees, invitees, or licensees.  Owner represents that all such items will be in good condition and repair at the commencement of the Lease and shall be maintained in good condition and repair during the term of the Lease.  If Owner fails to repair any such item within thirty (30) days following notice to Owner that repair, replacement or maintenance in necessary (or in the case of an emergency, such shorter time as is reasonable), Tenant may undertake repair, replacement or maintenance on Owner's behalf.  Owner shall reimburse Tenant for its costs of such repair, replacement or maintenance on demand, provided that if Owner does not reimburse Tenant within thirty (30) days after demand therefor, Tenant may setoff such costs against the Rent next due until fully paid.

All other repair, replacement or maintenance of the Premises shall be the responsibility of the Tenant, provided that Owner shall deliver the Premises to Tenant in good and clean condition on the Commencement Date with all the work delineated with a "*" on Exhibit C completed.

B.    Following the Commencement Date, Tenant shall pay all other costs of maintaining the Premises in the condition it is received, and the following items: (i) all real estate, personal property, and U & O taxes; (ii) all charges for water, sewer, landscaping, snowplowing, electricity, heat and all other utilities not paid by Tenant directly; (iii) all premiums payable to maintain any insurance coverage relating to the Building, including, but not limited to, costs of fire and extended coverage insurance as set forth in Section 9; (iv) repair and maintenance expenses incurred with respect to the Premises, excluding expenses for items of Owner's Work and expenses that are the sole responsibility of Owner under Section 7A above; (vi) any fine, penalty, interest or costs which may be added for non-payment or late payment of any of the foregoing to the extent caused by Tenant's default under this Lease (cumulatively, the "*Operating Expenses*").

Notwithstanding anything herein to the contrary, in connection with the *Additional Warehouse Space,* Tenant shall pay fifty (50%) of Additional Warehouse Proportionate Share of the Operating Expenses until June 30, 2011, provided further that if Tenant does not terminate its Lease of the Additional Warehouse Space under Section 5A above, following June 30, 2011, Tenant will pay Total Proportionate Share of all Operating Expenses within the Premises. Owner represents that the Operating Expenses are currently $1.25 per square foot per year.

6

710484519

Initials:⊥⊥_____

_____

C.      If Tenant does not lease the entire Building, it shall only pay its *"proportionate share"* (a fraction equal to the useable square footage of Tenant's Premises divided by the useable square footage of the Building) of the Operating Expenses. *"Additional Warehouse Proportionate Share"* shall be 36.33% or 49,766 useable square feet of Tenant's Premises. *"Main Warehouse and Office Space Proportionate Share"* shall be 45.26% or 62,010 useable square feet of Tenant's Premises. "Total Proportionate Share" shall be 81.59%.

D.      Utilities: From the Commencement Date, Tenant agrees to pay its proportionate share of all charges for gas, electricity, fire alarm system, telephone, sewer, sprinkler, water, cost of meter reading and any other utilities used by Tenant at the Premises.

E.      Tenant's Maintenance and Repairs and Owner's Repairs: Tenant shall, throughout the term of this Lease, take good care and maintain the Premises, including, but not limited to, windows and window frames and, the fixtures and appurtenances therein and at Tenant's sole cost and expense promptly make all repairs thereto and to the Premises, whether or not caused by or resulting from the carelessness, omission, neglect or improper conduct of Tenant, Tenant's servants, employees, invitees, or licensees, and whether or not arising from such Tenant conduct or omission. Tenant shall also repair all damage to the Building and the Premises caused by the moving of Tenant's fixtures, furniture or equipment. All the aforesaid repairs shall be of quality or class equal to the condition of the Building or Premises prior to such damage. If Tenant fails, after ten (10) day's written notice to proceed with due diligence to make repairs required to be made by Tenant, the same may be made by Owner at the expense of Tenant, and the expenses thereof incurred by Owner shall be collectible, as Additional Rent, after rendition of a bill or statement therefore.

F.      Use and Occupancy Permit: By December 1, 2010, Owner will deliver to Tenant a Use and Occupancy Permit for the Premises issued by the applicable governmental authority, allowing Tenant to use the Premises for Tenant's business purposes.

8.      PAYMENT OF RENT: Tenant agrees and understands that the Minimum Rent for the Premises is due and payable on the first day of each month. All Additional Rent shall be due within thirty (30) days of the date Tenant receives Owner's invoice. Notwithstanding anything contained herein to the contrary, in the event that the Minimum Rent or Additional Rent for any month is remains unpaid following ten (10) days prior written notice that it is past due, Tenant will be assessed a late payment charge of ten percent (10%) percent of the current unpaid Rent, which charge will be immediately due and payable. For purposes of this paragraph, Rent shall be deemed paid on the date of delivery to Owner's office, or on the postmark date of the envelope, whichever shall first

7

7104945v9

Initials: [signature]

occur. Weekends and national holidays are excluded from the computations for the purposes of this paragraph.

All rent payments shall be payable to 10551 Decatur Road Partners LP and mailed to P.O. Box 423, Brooklyn, NY 11222.

9.    TENANT'S INSURANCE:  Owner shall keep in full force and effect an Owner's fire and casualty insurance policy in the replacement value of the Building, which shall include extended coverage provisions, and shall also include liability, rent insurance and umbrella coverage. Tenant shall be responsible for its proportionate share of the cost of said premiums. Subject to the previous sentence, the amount of the insurance and the carrier shall be in the sole discretion of Owner.

a.    In addition to the insurance premiums enumerated above, Tenant agrees to obtain and keep in force for its own benefit and for the benefit of Owner general liability insurance in the amount of One Million ($1,000,000.00) Dollars per person, Three Million ($3,000,000.00) Dollars per accident, and Two Hundred and Fifty Thousand ($250,000.00) Dollars for property damage. Owner's name shall be included on all such policies as an additional insured. Upon written request, a copy of such policy or policies shall be delivered to Owner together with proof of payment of the premium. If it is not delivered or not paid upon such request, Owner may, after ten (10) days notice by mail to Tenant, procure and pay same, and the amount so paid, together with interest at the rate of seven (7%) per cent per annum shall be due as Additional Rent.

b.    Tenant, at its sole cost and expense, will keep leasehold improvements paid for by Tenant and any personal property owned or in its care, custody and control insured against All Risk of Loss in an amount at least equal to full replacement value or such other amount as is reasonably commercially available. Owner shall not be liable for any fire damages thereto or any theft thereof

c.    Tenant agrees, at Tenant's sole cost and expense, to promptly comply with and fulfill all notices and recommendations issued by participating insurance carriers in order to minimize hazards or prevent a loss as a result of Tenant's use and occupancy of the Premises during the Lease term and any extensions thereof.

d.    Tenant at its own cost and expense shall obtain and keep in force plate glass insurance covering all of the glass in the Premises and will deliver to Owner a duplicate copy of the policy with a receipt evidencing payment of the premium; if not delivered or not paid, Owner may after ten day notice by regular mail to Tenant, procure and pay same

8

71.0684.5.0

Initials: *JF*

and the amount so paid, together with interest at the rate of twelve (12%) per cent per annum, shall be due as Additional Rent.

10.      CONDITIONS AND USE OF THE PREMISES:  It is hereby mutually covenanted and agreed that except as specifically set forth in this Lease, the delivery of the Premises is being made by Owner to Tenant in its present condition "as is and where is" and that Owner has made no representation with respect to the physical condition thereof. Tenant shall keep the Premises in good order and repair during the Term and on the last day (or earlier termination) of the Term, Tenant shall surrender the Premises to Owner in good condition, broom swept, and in the original condition the Premises were leased, normal and ordinary wear and tear and casualty excepted. Tenant shall take all reasonable steps to repair any damage to the Premises occasioned by its use thereof during the Term.

11.      SECURITY DEPOSIT:  Upon the signing of this Lease Tenant shall pay to Owner the sum of $15,502.50, representing a sum equal to one (1) months' rent for Main Warehouse and Office Space, and on January 1, 2011, Tenant shall pay an additional $15,502.50, bringing the security deposit to a total of $31,005.00, representing a sum equal to (2) two months rent for Main Warehouse and Office Space, as a security deposit for Tenant's performance under this Lease. All security deposits may be commingled with the funds of Owner and any interest or other earnings derived from this security deposit shall be the sole property of Owner who shall not be required to account therefore to Tenant. It is agreed that in the event Tenant defaults in respect of any of the terms, provisions, and conditions of this Lease, including, but not limited to, the payment of Rent, Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any Rent or any other sum as to which Tenant is in default or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect to the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency in the re-letting of the Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Owner.  In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the security shall be returned to Tenant after the date fixed as the end of the Lease and after delivery of entire possession of the demised Premises to Owner.  Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that neither Owner nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. This amount may be commingled with the funds of Owner and any interest or other earnings derived from this security deposit shall be the sole property of Owner who shall not be required to account therefore to Tenant.

9

7:004550

Initials: ___

12.    SIGNS:  Tenant may install signs on the Premises, subject to Owner's approval, which will not be reasonable with held on the following conditions:

a.    All signs shall comply with the rules, regulations, requirements, and ordinances of all governmental authorities having jurisdiction including the payment of all fees and charges imposed; and

b.    Upon the expiration or early termination of this Lease, Tenant shall remove all signs and repair all damage to the building caused by the erection, maintenance or removal of the signs.

c.    All current signage on the Building to be leased by Tenant shall be removed at the sole expense of the Owner, including, but not limited, to any signage on dock doors or other entrances to be used by Tenant.  Owner shall remove all signage on the monument at the front of the Building referencing tenants who are no longer in the Building and Tenant shall have the right, at its sole cost and expense, to place its signage in any available space on such monument.

13.    BROKER:  Owner and Tenant represent that they have dealt with no broker except for "The Flynn Company" and "Sidney Gable Associates" whose commissions shall be paid by Owner.  Owner and Tenant shall each indemnify and hold harmless the other party from and against any and all claims, damages and costs (including reasonable attorneys' fees and disbursements) incurred by such other party in connection with breach or alleged breach of the indemnifying party's representation and warranty contained in this Section 13.  The provisions of this Section shall survive the cancellation or expiration of this Lease.

14.    NOTICES:  All notices and demands shall be served by mail and addressed to the party at the addresses hereinabove set forth or at such other location as may be designated by such party.

The address for notices to Tenant shall be the following:

MPC - Materials Processing Corporation
2300 Pilot Knob Road
Mendota Heights, MN 55120
Attention: David Kutoff

10

7104845v9

Initials: _____

with a copy to:

Leonard, Street and Deinard
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Attn: Timothy Welch, Esq.

The address for notices to Owner shall be the following:

10551 Decatur Road Partners, LP
P.O. Box 423
Brooklyn, NY 11222

With a copy to:

Tratner Molloy & Goodstein LLP
551 Fifth Avenue, Suite 2010
New York, NY 10176
Attn: Louis Tratner, Esq.

15.    RENOVATIONS AND ALTERATIONS:  No portion of the Premises may be demolished, removed, or altered by Tenant without the prior express written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed, and shall not be required for non-structural alterations that cost in the aggregate less than $50,000 per year. The consent of Owner is conditioned upon the submission of a full and complete set of plans drawn by a registered architect and approved by applicable governmental agency of the jurisdiction where the Premises are located. Owner reserves the right to submit the foregoing plans to the insurance carrier whose policy covers the Premises and in the event the insurance company does not approve, permission will be denied. Furthermore, in the event that the insurance company conditions its approval upon an increase in the insurance premiums, the entire increase shall be the responsibility of Tenant.

As to all renovations which are approved by Owner, the work shall be done by fully licensed and insured contractors who shall provide the appropriate certificates of insurance to Owner a week prior to commencement of work.

Any contract or agreement for labor or materials in connection with any such alteration or improvement shall provide that no lien or claim shall thereby be created or arise or be filed by

11

Initials:

anyone and before the commencement of any work, Tenant shall deliver to Owner a hold harmless against any lien which may be placed against the premises.

16.     DEFAULT:  Each of the following shall be deemed an Event of Default:

    a.     Default in the payment of Rent or other payments hereunder after ten (10) days prior written notice that Rent or such other payments are past due.

    b.     Default in the performance or observance of any covenant or condition of this Lease by Tenant to be performed or observed with are not cured within thirty (30) days after written notice thereof, provided that if the cure reasonably takes more than thirty (30) days to complete, Tenant shall have such additional time as is reasonably necessary as long as Tenant diligently undertakes to effect such cure.

    c.     Legal abandonment of the Premises by Tenant .

    d.     The filing or execution or occurrence of:

        i.     Filing a petition in bankruptcy by or against Tenant that \

        ii.     Filing a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other relief of the same or different kind under any provision of the Bankruptcy Act.

        iii.     Adjudication of Tenant as a bankrupt or insolvent: or insolvency in the bankruptcy equity sense.

        iv.     An assignment for the benefit of creditors whether by trust, mortgage, or otherwise.

        v.     A petition or other proceeding by or against Tenant for, or the appointment of, a trustee, receiver, guardian, conservator or liquidator of Tenant with respect to all or substantially all its property.

        vi.     A petition or other proceeding by or against Tenant for its dissolution or liquidation, or the taking of possession of the property of Tenant by any governmental authority in connection with dissolution or liquidation.

12

71048459

Initials:/

17.    TERMINATION.  Upon occurrence of any Event of Default, Owner may, at its option, in addition to any other remedy or right given hereunder or by law, give notice to Tenant that this Lease shall terminate upon the date specified in the notice, which date shall not be earlier than thirty (30) days after mailing or delivery of such notice.

The foregoing provisions for the termination of this Lease shall not operate to exclude or suspend any other remedy of Owner for breach, or for the recovery of said Rent for the full term.

18.    ACCELERATION.  Tenant expressly agrees and understand that upon Owner termination of this Lease, the entire remaining balance of unpaid rent for the remaining term of this Lease shall Accelerate, whereby the entire sum shall become immediately due, payable, and collectable. To the extent all owed by laws, Owner may hold the portion of Tenant security deposit remaining  after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated Rent.  Owner agrees to use its best effort to attempt to mitigate damages by reletting the space at the current fair market value. Tenant  will only be responsible for any deficiencies (if any).

19.    REPOSSESSION:  Upon termination of this Lease as provided herein, or pursuant to statute, or by summary proceedings or otherwise. Owner may enter forthwith, without further demand or notice to Tenant, and resume possession of the Premises.  In no event shall such re-entry or resumption of possession or reletting as hereafter provided be deemed to be acceptance or surrender of this Lease or a waiver of the rights or remedies of Owner hereunder.

20.    RELETTING AFTER TERMINATION:  Upon termination of this Lease in any manner above provided, Owner shall use reasonable efforts to relet the Premises.

21.    DAMAGES:  Upon termination of this Lease in any manner above provided, or by summary proceedings or otherwise, Tenant shall pay to Owner without demand or notice the following:

All Rent and other payments accrued to the date of such termination and a proportionate part of the rent otherwise payable for the month in which such termination occurs.

All future Rent and other payments to be due under the terms of this Lease as and when due to the extent Owner has not been able to offset same by reletting the Premises, provided that Owner commences a good faith effort to relet the Premises.

The costs of making all repairs, alterations and improvements reasonably required to be made by Owner hereunder, and of performing all covenants of Tenant relating to the condition of the Premises during the Term and upon expiration or sooner termination of this Lease, such cost to be deemed

13

7101845v9

Initials: _____

prima facie to be the costs estimated by a reputable architect or contractor elected by Owner or the amounts actually expended or incurred thereafter by Owner, including reasonable attorneys fees and other reasonable costs.

22.    EXCLUSIVITY OF OWNER'S REMEDIES:  The receipt of Rent after default, or after judgment or after execution, shall not deprive Owner of other actions against Tenant for possession or for Rent or for damages, and all such remedies are non-exclusive and can be exercised concurrently or separately as Owner desires.

23.    DEFAULT BY OWNER:  In the event of any default by Owner, Tenant, before exercising any rights that it may have at law to cancel this Lease, must first send notice by registered or certified mail, or hand delivery, to Owner, and shall have offered Owner thirty (30) days in which to correct and cure the default or commence a good faith effort to cure such default.

24.    OWNER NOT LIABLE FOR INJURY OR DAMAGE TO PERSONS OR PROPERTY:  Owner shall not be liable for any injury or damage to any person or to any property at any time on said Premises or building from any cause whatever that may at any time exist from the use or condition of the Premises or building from any cause, during the Term or any renewal of this Lease, unless such injury is caused by Owner's negligence or willful misconduct.

25.    RIGHT OF RE-ENTRY:  Except in case of emergency when Owner may enter the Premises at any time, Owner shall have the right, by itself or agent or with others and with prior notice to the Tenant and accompanied in all cases by a representative of Tenant, enter the Premises at reasonable hours to examine or exhibit the Premises, or to make such repairs and alterations as shall be deemed necessary for the safety and preservation of the Building, to inspect and examine, to post such notices as Owner may deem necessary to protect Owner against loss from liens of laborers, material men or others, and for the purpose of permitting or facilitating Owner's performance of its obligations hereunder, or for any other reasonable purpose which does not materially diminish Tenant's enjoyment or use of the Premises, provided same does not materially disrupt Tenant's operation thereat.

26.    HOLDOVER:  If Tenant shall holdover after the expiration of the Term hereof, with the consent of Owner, express or implied, such tenancy shall be from month to month only, and not a renewal hereof; and Tenant agrees to pay Rent and all other charges as provided herein, and also to comply with all covenants of this Lease for the time Tenant holds over.  Tenant shall be entitled to possession until Owner has given Tenant thirty (30) days notice that such month to month tenancy shall be terminated; otherwise, notice is only required as hereinafter provided as notice of default.

14

7104845v9

Initials: _____

Tenant's holding over beyond the expiration of the notice period of a lawful Notice of Termination constitutes holding over without the consent of Owner, and Tenant shall be construed to be a Tenant at sufferance, at 105% of the Minimum Rent herein provided, prorated by the day until possession is returned to Owner, without limitation to Owner's remedies and rights of recovery under applicable law.

27.     NATURE OF RELATIONSHIP BETWEEN PARTIES:  The sole relationship between the parties created by this agreement is that of Owner and Tenant.  Nothing contained in this Lease shall be deemed, held, or construed as creating a joint venture or partnership between the parties.

28.     RIGHT OF OWNER TO PAY OBLIGATIONS OF TENANT TO OTHERS:  If Tenant shall fail or refuse to pay any sums due to be paid by it under the provisions of this Lease, or fail or refuse to maintain the Premises or any part thereof as herein provided, then, and in such event, Owner, after 10 day's prior notice in writing by Owner to Tenant, shall have the right to pay any such sum or sums due to be paid by  Tenant and to do and perform any work reasonably necessary to the proper maintenance of the Premises; and the amount of such sum or sums paid by Owner for the account of Tenant and the cost of any such work, together with interest on such amount at the rate of twelve (12) percent per annum from the date of payment by Owner until the repayment to Owner by Tenant, shall be paid by Tenant upon demand in writing.  The payment by Owner of any such sum or sums or the performance by Owner of any such work shall be prima facie evidence of the necessity for such work.

29.     MECHANICS AND OTHER LIENS IMPOSED BY TENANT:  Tenant shall keep the Premises and the improvements at all times during the term free of mechanics and material men's liens and other liens of like nature, other than liens created and claimed by reason of any work done by or at the instance of Owner, and at all times shall fully protect and indemnify Owner against all such liens or claims and against all attorneys' fees and other costs and expenses growing out of or incurred by reason or on account of any such liens or claims.  Should Tenant fail to fully discharge or have removed from the Building any such lien or claim, Owner, at its option, may pay the same or any part thereof, and Owner shall be the sole judge of the validity of such lien or claim.  All amounts so paid by Owner, together with interest at the rate of twelve (12) percent per annum from the time of payment by Owner until repayment by Tenant, shall be paid by Tenant upon demand, and if not so paid, shall continue to bear interest at the aforesaid rate, interest payable monthly, as Additional Rent.

30.     COMPLIANCE WITH LAWS:  Tenant shall at its sole cost and expense, comply or cause compliance with any and all laws and regulation of federal, state, municipal and local governments,

15

T10184509

Initials: _____

departments, commissions and boards, pursuant to law, which may impose any violation, order or duty upon Tenant with respect to the Premises, arising out of Tenant's use thereof.

31.   CONDEMNATION CLAUSE:  In the event that all of the Premises is taken by eminent domain or conveyed in lieu of eminent domain, if the Premises cannot reasonably be used by Tenant for their intended purpose, then this Lease will terminate effective as of the date that the condemning authority shall take ownership of the Premises.

32.   FIRE CLAUSE:  Tenant agrees to notify Owner of any damages to the Premises by fire or other hazard and also of any dangerous or hazardous condition within the Premises immediately upon the occurrence of such fire or other hazard or discovery of such condition.

        Upon occurrence of a fire or other casualty, repairs shall be made by Owner as soon as reasonably may be done unless the costs of repairing the Premises exceed 25% of the replacement cost of the Building in which case Owner may, at option, terminate this Lease by giving Tenant written notice of termination within 30 days of the date of the occurrence.

        If Owner does not terminate this Lease pursuant to the paragraph above, then Owner has 30 days after the date of occurrence to give written notice to Tenant setting forth its unqualified commitment to make all necessary repairs or replacements, the projected date of commencement of such repairs, and Owner's best good faith estimate of the date of completion of the same, provided that if the repairs take more than one hundred fifty (150) days following the occurrence, Tenant may terminate this Lease by written notice to Owner.

33.   WAIVER OF NONPERFORMANCE:  Failure of Owner to exercise any of its rights under this Lease upon nonperformance by Tenant of any condition, covenant or provision herein contained shall not be considered a waiver, nor shall any waiver of nonperformance of any such condition, covenant or provision by Owner be construed as a waiver of the rights of Owner as to any subsequent defective performance or nonperformance hereunder.

34.   PAROL EVIDENCE CLAUSE:  This instrument constitutes the final, fully integrated expression of the agreement between Owner and Tenant, and it cannot be modified or amended in any way except in writing signed by Owner and Tenant.

35.   LIMITATION OF LIABILITY:  The liability of Owner under this Lease and all matters pertaining to or arising out of the tenancy and the use and occupancy of the Premises, including, but not limited to matters or claims of whatever nature arising out of or caused by the negligence of

16

710185349

Initials:

Owner, his agents or employees, shall be limited to Owner's interest in the property of which the Premises form a part. Owner represents and warrants that it is Owner of all the property defined as used throughout this Lease. In no event shall Tenant make any claim against or seek to impose any personal liability against Owner's independent assets.

36. ACCESS TO PREMISES: Tenant agrees that Owner or Owner's agent is permitted to enter the Premises during usual business hours for the purpose of inspection or otherwise, provided that Owner must give Tenant reasonable prior notice Tenant agrees to exhibit the Premises for the purpose of rental, and, during the last six (6) months of the term provided for in this Lease, to permit the prominent posting of the usual "to let" notices.

37. FAILURE OF ENFORCEMENT: The failure of the Owner to insist, in any one or more instances, upon the strict performances of any of the covenant or condition of this Lease, or to exercise any option herein contained or conferred, shall not be construed as waiving or relinquishing for the future any such covenant, condition or option, but the same shall continue and remain in full force and effect to this end:

38.   SURRENDER: The parties hereto agree that no act or acts, thing or things done by Owner, its agents, or employees, during the term hereby granted, shall be deemed as an acceptance of a surrender of the Premises or any part thereof, or of this Lease. It shall not be valid unless the same be in writing and subscribed by Owner or its duly authorized agent, anything to the contrary herein contained or implied, notwithstanding.

39.   PERMITS: Except as otherwise set forth in this Lease, if any permits or licenses are required as a pre-condition for commencing Tenant's particular business at the Premises (as opposed to general office or warehouse use), the obtaining of same shall be the sole responsibility and cost of Tenant, provided that responsibility for any use and occupancy permit required for Tenant's use of the Premises shall be the responsibility of Owner. Tenant shall not commence doing business at the Premises until such time as all required permits have been obtained and compliance with all necessary requirements for the conduct of Tenant's business have been obtained.

40.   SUBORDINATION: This Lease is subordinate to the lien of all present and future mortgages that affect the premises, and to all renewals, modifications, replacements and extensions of the Lease; Tenant agrees to promptly execute and deliver any estoppel certificates and subordination, nondisturbance and attornment agreements, in a form reasonably acceptable to Tenant and its legal counsel, that Owner may request, within ten (10) business days after written request therefor.

17

719864547

Initials: _____

41.     ASSIGNMENT:  Lessee agrees not to assign this Lease, nor to sub-let the premises or any part thereof without the prior written consent of Owner, under penalty of instant forfeiture of the Lease. Such consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, an assignment or subletting of all of the Premises (a)  to an affiliate of Tenant (an entity which is controlled by, controls, or is under common control with, Tenant) or (b) in connection with a sale of Tenant 's business, whether a sale of substantially all of either Tenant's assets or stock, shall not be deemed a Transfer under this Article, provided that (i) Tenant notifies Owner of any such assignment or sublease and promptly supplies Owner with any documents which Owner may reasonably request, including, but not limited to, proof that the assignee following the assignment will have at least the net worth of the Tenant at the commencement of the Lease, (ii) the transferee, assignee, or sublessee assumes in full the obligations of Tenant under this Lease, and (iii) Tenant remains liable for all obligations under this Lease.

42.     ENVIRONMENTAL:  A.  Prior to execution of this Lease Owner shall have delivered to Tenant that certain Phase I Environmental Report prepared by Environmental Consulting, Inc. dated October 13 2006.  Owner represents and warrants to Tenant, that the information in the report is the only information of which Owner has knowledge with respect to the environmental condition of the premises.  Owner has received no notice nor knows any facts, which might constitute a violation of any federal, state, or local environmental laws, rules, or regulations.

        B.  Tenant covenants and agrees that it will use the Premises in compliance with any local, state or federal hazardous material and waste laws or other environmental laws or regulations and Tenant specifically shall indemnify and hold Owner harmless for any costs, expenses, etc. incurred by Owner in default of this covenant by Tenant and any work or expense for such compliance shall be the sole responsibility of Tenant.  At the termination of this Lease, Tenant shall remove any tanks or storage of any hazardous material or waste substances installed by Tenant.  Tenant shall dispose of any cleaning materials, including rags, cloths, liquids, gases, or chemical compounds brought onto the Premises by Tenant off of the Premises promptly and according to any applicable laws, regulations, etc after use, and will not store or allow its employee to store any of the same at the Premises.

        C. If at any time during the Term or immediately following the termination, an environmental investigation finds hazardous wastes or hazardous materials on, in or under the Premises (other than those stored on the Premises in accordance with applicable laws and regulations then in effect, which will be removed in accordance with applicable laws upon departure from the Premises) which were introduced to the Premises by Tenant, then Tenant shall be obligated at its sole cost and expense to remove, remediate or take such required action with regards to the new findings in accordance with

18

710184sv9

Initials: _____

applicable laws at the time Owner requests it from Tenant. Tenant agrees to defend, indemnify, and hold Owner harmless from and against any and all claims, lawsuits, losses, liabilities, damages, and expenses, including without limitation cleanup costs and reasonable attorneys' and consultants' fees arising by reason of same.

D.  Owner agrees to defend, indemnify, and hold Tenant harmless from and against any and all claims, lawsuits, losses, liabilities, damages, and expenses, including without limitation cleanup costs and reasonable attorneys' and consultants' fees arising from the presence of hazardous wastes or hazardous materials on, in or under the Premises or Building that were not introduced to the Premises by Tenant.

43. WAIVER OF TRAIL BY JURY:  It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trail by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy.  It is further mutually agreed that in the event Owner commences any summary proceeding for possession of the Premises, Tenant will not interpose any counter claim of whatever nature or description in any such proceeding, unless such claim is obligatory in order to preserve Tenant's rights.

44.    MISCELLANEOUS:

A.  For purposes of this Lease: (i) whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation, (ii) whenever the context may require, pronouns shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa, (iii) the word "or" is not exclusive and the word "including" is not limiting, (iv) references to a law include any rule or regulation issued under the law, rule or regulation, (v) references to an Exhibit mean an Exhibit attached to this Lease, and (vi) caption headings are for convenience and reference only and do not define, modify or describe the scope or intent of any of the terms of this Lease.

B.  This Lease will be interpreted and enforced in accordance with its provisions and without the aid of any custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provisions in question.

19

710045X9

Initials: _____

C.  This Lease does not constitute an offer by Owner to lease the Premises to Tenant, and Tenant shall have no rights with respect to the leasing of the Premises unless and until Owner delivers to Tenant an original executed counterpart of this Lease executed by Tenant and Owner.

IN WITNESS WHEREOF, the parties have hereunto set their hands or caused these presents to be signed by its proper officers, as of the day and year first above written.

TENANT:                                          OWNER:

MATERIALS PROCESSING CORPORATION     10551 DECATUR RD PARTNERS, LP

By: _____           By: _____

Printed Name: _____        Printed Name: Sam McKenzie

Title: _____        Title: _____

20

Initials: _____

# EXHIBIT B

## AMENDMENT NO. 1 TO LEASE

THIS AMENDMENT NO. 1 TO LEASE (this *"Amendment"*) is entered into as of June 14, 2011 , between **10551 Decatur Road PARTNERS, L.P.,** a Pennsylvania limited partnership ("Landlord"), and **Materials Processing Corporation,** a Minnesota corporation ("Tenant").

### WITNESSETH

WHEREAS, Landlord and Tenant entered into that certain Lease dated October 1,2010 (hereinafter the *"Lease"*) demising premises located at   10551 Decatur Road, Philadelphia, Pennsylvania as more particularly described in the Lease;

WHEREAS, the parties hereto desire to amend the Lease, as hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, with intent to be legally bound, hereby agreed as follows:

Increase of Premises.  Landlord and Tenant hereby agree that as of June 14, 2011 Tenant leases from Landlord an additional 6,400 sq. ft. of Office Space *(the "Additional Office Space")* in the building situated at 10551 Decatur Road, Philadelphia, Pennsylvania  as more particularly described in and attached hereto as Exhibit A

Tenant to occupy "Additional Warehouse Space"   (A) As of June 14,2011 Tenant shall occupy and move into the "Additional Warehouse Space" (49,766 square feet).and B)Tenant agrees NOT  to exercise its option of Termination Rights with respect to the Additional Warehouse Space as more specifically described in Section 5A of *the Lease*

**Minimum Monthly Rent.** The Minimum Monthly Rent under this *Amendment* shall be:

| Term | Monthly Minimum Rent: *Additional Office Space* | Monthly Minimum Rent: *Additional Warehouse Space* | Total Monthly Minimum Rent Including: *Main Warehouse, Office Space, Additional Warehouse Space, Additional Office Space* |
|---|---|---|---|
| 6/1/2011 thru 11/30/2011 | $0.00 | $0.00 | $0.00 |
| 12/1/2011 thru 11/30/2012 | $1,600.00 | $12,441.50 | $29,544.00 |
| 12/1/2012 thru 11/30/2013 | $1,733.33 | $13,478.29 | $32,006.00 |
| 12/1/2013 thru 11/30/2014 | $1,866.67 | $14,515.08 | $34,468.00 |
| 12/1/2014 thru 11/30/2015 | $1,925.33 | $14,971.27 | $35,551.28 |
| 12/1/2015 thru 11/30/2016 | $1,984.00 | $15,427.46 | $36,634.56 |
| 12/1/2016 thru 11/30/2017 | $2,042.67 | $15,883.65 | $37,717.84 |
| 12/1/2017 thru 11/30/2018 | $2,101.33 | $16,339.84 | $38,801.12 |

**Additional Rent, Operating Expenses, Utilities:** All additional rent charges shall be the same as in the original *Lease*, provided that with the addition of the Additional Office Space, Tenant's Proportionate Share shall be 86.26% based on a total building useable square footage of 136,997 square feet and Tenant's total useable square footage (with the Additional Office Space) of 118,176 square feet.

**Landlord's Work:** See Exhibit B attached hereto.

**Miscellaneous.** Except as modified by this Amendment, all of the terms and conditions of the Lease shall remain in full force and effect, and the Lease is hereby ratified in its entirety. If there is any conflict between this Amendment and the Lease, this Amendment shall control. Except where the context otherwise requires, all references in this to the Lease shall be deemed to include the provisions of this Amendment. This Amendment constitutes an amendment to the Lease and contains the entire agreement of the parties with respect to the subject matter hereof, and all prior or contemporaneous verbal understandings, if any, are superseded by this Amendment. This Amendment may not be amended except by a written document signed by both parties. This Amendment shall be

2

binding upon and inure to the benefit of Landlord and Tenant and their respective successors and assigns. This Amendment may be executed in several counterparts, all of which constitute one agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart. Electronic facsimiles of signatures shall be acceptable and binding upon the parties hereto.

**IN WITNESS WHEREOF**, the Landlord and Tenant have caused this Amendment to be executed on the date first written above.

**LANDLORD:**
**10551 DECATUR ROAD PARTNERS, L.P.,**

By: _____

Name: _____ Sam   Markowts _____

Title: _____ 6|13|11 _____

**TENANT:**
**MATERIALS PROCESSING CORPORATION**

By: _____ June 13th 2011 _____

Name: _____ Willia _____

Title: _____ Vice President of Operations _____

Bill Hort

3

# EXHIBIT C



**FLASTER GREENBERG**

ATTORNEYS AT LAW • A PROFESSIONAL CORPORATION

1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900
Fax: (856) 661-1919
www.flastergreenberg.com

**MICHELE G. TARANTINO, ESQUIRE**
Member of NJ & NY Bar
Direct Dial: (856) 661-2274
E-Mail: michele.tarantino@flastergreenberg.com
PLEASE RESPOND TO CHERRY HILL

July 11, 2014

*Via Certified Mail, RRR and Email*
Mr. David Kutoff
Materials Processing Corporation
2300 Pilot Knob Road
Mendota Heights, MN 55120

> Re: *Lease Agreement dated October 1, 2010, as amended by Amendment No. 1 to Lease dated June 14, 2011 (collectively, the "Lease"), by and between Drummond Decatur and State Properties LLC, as successor-in-interest to 10551 Decatur Road Partners, LP ("Landlord"), and Materials Processing Corporation ("Tenant"), for certain warehouse and office space (collectively, the "Premises"), located at 10551 Decatur Road, Philadelphia, Pennsylvania*

Dear Mr. Kutoff:

This letter is to advise you that Tenant is now in default under the Lease for failure to pay the Minimum Rent due and owing under the Lease for the month of July 2014. As provided under Section 8 of the Lease, should Tenant fail to pay the Minimum Rent due and owing under the Lease for the month of July 2014 within ten (10) days of the date of this letter, Landlord will assess all applicable late payment fees and charges.

Additionally, please be advised that Tenant continues to be in default under the Lease for the non-payment of Operating Expenses as required under Section 6 of the Lease. Landlord previously requested payment of such arrearages by letter day June 24, 2014 (copy attached). As Tenant failed to pay these Additional Rent amounts within the 10-day grace period provided for payment, Landlord will assess all applicable late payment fees and charges, pursuant to its rights under Section 8 of the Lease.

Nothing herein shall be deemed to waive, limit or otherwise modify Landlord's rights under the Lease or otherwise at law or in equity.

Very truly yours,

FLASTER/GREENBERG P.C.

Michele G. Tarantino

MGT/mlw
cc:   Timothy Welch, Esq, Leonard, Street and Deinard (*via Certified Mail, RRR*)
       Michael Ricatto (*via email*)

4154657



FLASTER
GREENBERG
ATTORNEYS AT LAW • A PROFESSIONAL CORPORATION

1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900
Fax: (856) 661-1919
www.flastergreenberg.com

MICHELE G. TARANTINO, ESQUIRE
Member of NJ & NY Bar
Direct Dial:  (856) 661-2274
E-Mail: michele.tarantino@flastergreenberg.com
PLEASE RESPOND TO CHERRY HILL

June 24, 2014

*Via Certified Mail, RRR and Email*
Mr. David Kutoff
Materials Processing Corporation
2300 Pilot Knob Road
Mendota Heights, MN 55120

> Re:  *Lease Agreement dated October 1, 2010, as amended by Amendment No. 1 to*
> *Lease dated June 14, 2011 (collectively, the "Lease"), by and between Drummond*
> *Decatur and State Properties LLC, as successor-in-interest to 10551 Decatur*
> *Road Partners, LP ("Landlord"), and Materials Processing Corporation*
> *("Tenant"), for certain warehouse and office space (collectively, the "Premises"),*
> *located at 10551 Decatur Road, Philadelphia, Pennsylvania*

Dear Mr. Kutoff:

We are in receipt of your email correspondence dated June 19, 2014 advising Landlord of its alleged failure to maintain the building.  While we have previously received correspondence from you with respect to certain maintenance issues relating to the roof, at no time prior to this most recent email exchange has the Tenant notified Landlord of any additional maintenance concerns.

Pursuant to the terms of the Lease, with the exception of certain specified items, the Tenant is responsible for any and all necessary maintenance, repairs and/or replacements to the Premises.  Accordingly, if there are any specific items in need of maintenance or repair, and for which Landlord is responsible under the Lease, we would ask that you please provide Landlord with written notice of same in accordance with the provisions of the Lease.  As noted in my prior correspondence, Landlord has already repaired the roof damage that was at issue.

Please also be advised that Tenant continues to be in default under the Lease for the non-payment of Operating Expenses as required under Section 6 of the Lease.  Landlord expects any and all such arrearages to be paid within ten (10) days of the date of this letter  As provided under Section 8 of the Lease, should Tenant fail to pay these Additional Rent amounts, Landlord will assess all applicable late payment fees and charges.

Mr. David Kutoff
June 24, 2014
Page 2

Nothing herein shall be deemed to waive, limit or otherwise modify Landlord's rights under the Lease or otherwise at law or in equity.

Very truly yours,

FLASTER/GREENBERG P.C.

Michele G. Tarantino

MGT/mlw

cc:     Timothy Welch, Esq, Leonard, Street and Deinard (*via Certified Mail, RRR*)
        Michael Ricatto (*via email*)

4118378



1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900
Fax: (856) 661-1919
www.flastergreenberg.com

**MICHELE G. TARANTINO, ESQUIRE**
Member of NJ & NY Bar
Direct Dial:  (856) 661-2274
E-Mail: michele.tarantino@flastergreenberg.com
PLEASE RESPOND TO CHERRY HILL

June 11, 2014

<u>*Via Certified Mail, RRR and Email*</u>
Mr. David Kutoff
Materials Processing Corporation
2300 Pilot Knob Road
Mendota Heights, MN 55120

> **Re: *Lease Agreement dated October 1, 2010, as amended by Amendment No. 1 to
Lease dated June 14, 2011 (collectively, the "Lease"), by and between Drummond
Decatur and State Properties LLC, as successor-in-interest to 10551 Decatur
Road Partners, LP ("Landlord"), and Materials Processing Corporation
("Tenant"), for certain warehouse and office space (collectively, the "Premises"),
located at 10551 Decatur Road, Philadelphia, Pennsylvania (the "Property")***

Dear Mr. Kutoff:

This office represents Landlord.  We are in receipt of your letter dated June 3, 2014
advising Landlord of Tenant's intention to cease paying rent as the result of the alleged failure of
Landlord to repair the damaged roof at the Property.

As you are well aware, Tenant does not have any right to simply cease paying rent under
the Lease.  The applicable provisions of the Lease with respect to the repair and maintenance of
the roof are contained in Section 7 of the Lease.  That section provides specific notice and cure
provisions (including limited rent abatement rights) to be followed by Tenant in the event that
Landlord fails to perform its obligations with respect to the repair of the roof.  Absent strict
adherence with these provisions, Tenant does not have any right to withhold rent from Landlord.
Additionally, in this instance, the provisions of Section 7 would not apply, and there is no
justification whatsoever for Tenant to refuse to pay any rent amounts owing under the Lease, as
Landlord has already repaired the roof damage at issue (see attached invoice from Landlord's
roofing contractor).

Accordingly, Landlord expects any and all rent due under the Lease to be paid in a timely
manner.  Should tenant fail to do so, Tenant shall be in default under the Lease.  Additionally, as
provided under Section 8 of the Lease, Landlord will assess all applicable late payment fees and
charges should Tenant cease paying rent in accordance with the terms of the Lease.

Mr. David Kutoff
June 11, 2014
Page 2

Nothing herein shall be deemed to waive, limit or otherwise modify Landlord's rights under the Lease or otherwise at law or in equity.

Very truly yours,

FLASTER/GREENBERG P.C.

Michele G. Tarantino

MGT/mlw
Enclosure

cc:     Timothy Welch, Esq, Leonard, Street and Deinard (*via Certified Mail, RRR*)
        Michael Ricatto (*via email*)

3563723v2

FROM                                          (FRI)MAY   ● 2014  11:49/ST. 11:42/No. 7822049109  P  1

## City Wide Roofing, INC

1-800-New-Roof

7337 Wissinoming St
Philadelphia, PA 19136
Phone: 215-332-2228
Fax: 215-331-2702

**INVOICE**

DATE:

BILL TO:                          Work Complete 5/7/14
Ricatto Properties
10551 Decatur Rd
Philadelphia, PA 19154
718-441-5629

| DESCRIPTION | AMOUNT |
|---|---|
| **Top Main Roof** | |
| Fully inspect the entire upper and lower roofs | |
| Remove any and all debris from the surface area | |
| Make all necessary repairs to the roof deck | |
| Cut back and dispose of all loose rubber membrane | |
| Apply fully welded torchdown rubber roof system to the rubber that was cut away | |
| Field wrap all roof protrusions | |
| Apply cement and 4" fabric to all HVAC units | 6,000.00 |

| | |
|---|---|
| SUBTOTAL | |
| PAID | |
| **TOTAL** | |

DIRECTIONS
1. Payment due upon job completion
2. If you would like to pay by credit card
please call the office at 215-332-2228

Make all checks payable to
City Wide Roofing Inc

If you have any questions about this invoice, please contact
Office / 215-332-2228

*Thank you for choosing City Wide Roofing!*

# City Wide Roofing, INC

# INVOICE

1-800-New-Roof

| | | | DATE: | |
|---|---|---|---|---|

7337 Wissinoming St
Philadelphia, PA 19136
Phone: 215-332-2228
Fax: 215-331-2702

| BILL TO | | Work Complete 5/7/14 | | |
|---|---|---|---|---|

Ricatto Properties
10551 Decatur Rd
Philadelphia, PA 19154
vanessa@ricatto.com

| DESCRIPTION | AMOUNT |
|---|---|
| Top Main Roof | |
| Fully inspect the entire upper and lower roofs | |
| Remove any and all debris from the surface area | |
| Make all necessary repairs to the roof deck | |
| Cut back and dispose of all loose rubber membrane | |
| Apply fully welded torchdown rubber roof system to the rubber that was cut away | |
| Field wrap all roof protrusions | |
| Apply cement and 4" fabric to all HVAC units | 6,000.00 |

*Spoke To: Vivi*
*06-09-2014*
*$6,000.00*

| | SUBTOTAL | |
|---|---|---|

**OTHER COMMENTS**
1. Payment due upon job completion
2. If you would like to pay by credit card
please call the office at 215-332-2228

| | TOTAL | |
|---|---|---|

Make all checks payable to
City Wide Roofing Inc

If you have any questions about this invoice, please contact
Office / 215-332-2228

*Thank you for choosing City Wide Roofing!*

ASPHALT * RUBBER * SHINGLES * SLATE * TILE

# CITY WIDE ROOFING INC.

Satisfaction Guaranteed

FREE ESTIMATES

215-332-2228 * Fax 215-331-2702

7337 Wissinoming Street * Philadelphia, PA 19136

Attorney General
Registration No.
PA 058851

Name: Ricatto Properties                           Date: 5-5-14

Address: 10551 Decatur Rd 19154                    Estimator: John 267-770-6533

Phone: 718-441-4100

Fax: 718-441-5629

Email: vanessa@ricatto.com

# WORK ORDER

**Top Main Roof**

- Fully inspect the entire upper and lower roofs

- Remove any and all debris from the surface area

- Make all necessary repairs to the roof deck

- Cut back and dispose of all loose rubber membrane

- Apply fully welded torchdown rubber roof system to the the rubber was cut away

- Field wrap all roof protrusions

- Apply cement and 4" fabric to all HVAC units

*Remove all job related debris*

**Terms and Conditions of Payment: COD ALL DISCOUNTS INCLUDED Full Price $6,000.00**

| REPAIRS: | New Roof: |
|---|---|
| City Wide Roofing will return up to 1 time to correct any problem on repaired area. If repair does not correct the problem, City Wide roofing will credit ½ the cost of the repair towards the purchase of a new roof from this company. | New roofs will be guaranteed against defects in material and workmanship for a period of 15 years. Guarantee will become void if anyone other than City Wide Roofing agents or mechanics walk on or tamper with new roofing. We are not responsible for any interior or exterior damage, before or after the work is complete. |

We are not responsible for T.V. Antennas or wires. Any work ordered by customer, before, during, or after work is completed that is not above will become an additional charge. You, the buyer, may cancel this transaction anytime prior to midnight of the third business day after the date on this transaction. [*See the attached notice of cancellation form for an explanation of this right*] This warranty gives you, the customer, specific legal rights and you may also have other rights. City Wide Roofing will execute the work diligently without interruption. No work will be sub-contracted. All work will be performed by City Wide Roofing Certified Mechanics.

We, the undersigned, agree to this contract as written

X _____     Date 05-06-2014

Customer

X _____     Date _____

City Wide Roofing Corporation

# EXHIBIT D

**Uldschmidt, Lisa**

| | |
|---|---|
| **From:** | Suzanne Schiller [SSchiller@mankogold.com] |
| **Sent:** | Wednesday, May 13, 2015 8:51 AM |
| **To:** | Cohen, Jeffrey |
| **Cc:** | Tarantino, Michele; Uldschmidt, Lisa |
| **Subject:** | RE: DDS v. MPC [MPC's delays re:  environmental issues] |

Jeff –


I assure you that my client is not acting in bad faith, and it was not until yesterday that
it was able to assemble sufficient information for a management discussion on this issue so
that I could respond.


To answer your questions, as we have discussed in the past, the facility cannot be relet
until the potentially lead-impacted areas are cleaned.   MPC has recently received a proposal
for clean-up which is in excess of the amount it had anticipated it would cost and, as you
and your client have known for quite some time, MPC has suffered significant financial loses
and, quite frankly, does not have funds to pay for this clean-up.  However, it believes that
these costs are covered by its insurance policy, has submitted a claim to the carrier and is
awaiting confirmation that the carrier will cover these expenses.


Certainly, if my client could do more at this time it would as it is obviously in both
parties' best interests for the facility to be cleaned as quickly as possible so that it can
be released.   We hope to have a response from the carrier by the time of the mediation so I
would encourage your client not to cancel.  My client has made arrangements to come to
Philadelphia from Minnesota which should provide you and your client with sufficient
assurances that it is interested in resolving these matters, and I sincerely believe that
Judge Strawbridge can help the parties move forward.


I will be out of the office today for a hearing in Lycoming County, but will be back tomorrow
if you would like to discuss this further.




Suzanne (Shoshana) Schiller

484-430-2354

# EXHIBIT E



**CHUBB GROUP OF INSURANCE COMPANIES**
Claim Service Center
600 Independence Parkway
P.O. Box 4700
Chesapeake, Virginia 23327-4700
Phone: (800) 252-4670    Facsimile: (800) 664-1765

June 8, 2015

Kelly Jerde
Materials Processing Corporation.
2300 Pilot Knob Road
Mendota Heights, Minnesota 55120-1116

RE:    Insured:        Materials Processing Corporation
       Policy No.:     3731-30-19 (12/15/12 – 12/1515)
       Claim No.:      040515027090
       Matter:         Lead Contamination
       Loss Location:  10551 Decatur Road, Philadelphia, Pennsylvania
       Company:        Chubb Custom Insurance Company

Dear Ms. Jerde:

Chubb Custom Insurance Company ("Chubb") previously acknowledged the tender of the above captioned claim by HUB International Midwest on behalf of Materials Processing Corporation ("MPC.")

Chubb has now had the opportunity to review this matter for the purpose of analyzing coverage under Environmental Liability Insurance policy 3731-30-19.    Chubb respectfully denies coverage under policy 3731-30-19 because the loss location is not scheduled to the policy, and the known incident exclusion precludes coverage.    The reasons for its position are set forth in greater detail below.

## Claim Details

We will now summarize the facts of the claim.    Although we include the facts that we believe are pertinent to our analysis, please refer to all claim documentation associated with this claim when reviewing this letter.

MPC leased and operated a facility located at 10551 Decatur Road, Philadelphia, Pennsylvania ("the Site") where, among other things, MPC recycled computer monitors, which included a cathode ray tube shedding operation.    MPC no longer operates the facility.

MPC hired Integrated Loss Control to conduct an industrial hygiene investigation at the Site.    Integrated Loss Control conducted sampling at the Site on April 22, 2014 and issued a final report on May 29, 2014 indicating there was lead contamination at the Site. Please provide me with a copy of the report.

Materials Processing Corporation
10551 Decatur Road, Philadelphia, Pennsylvania
June 8, 2015
Page 2

The initial tender indicated MPC is in litigation with the owner of the facility.   Please
provide me with copies of the pleadings.

## The Policy

Chubb issued policy 3731-30-19 to MPC.   It provides claims made Environmental
Liability Insurance.  The relevant policy period is 12/15/2012 to 12/15/2015.  The policy
is written under Form 70-02-1400 (Ed. 4-11) along with endorsements.  The Policy in the
part relevant to this claim provides limits of $10 million each pollution incident and $10
million aggregate, with a $10 thousand Self Insured Retention for Off Site Insured
Operations Liability.  The Off Site Insured Operations Liability coverage was added to
the policy by way of an endorsement effective 12/15/14.

The 10551 Decatur Road, Philadelphia, Pennsylvania site is not listed as an Insured Site
on the Policy.

## Coverage Analysis

Please note that excerpts of certain policy provisions are set forth in this letter. This
information is provided to assist in your review of our analysis. The positions set forth in
this letter are based on all of the provisions of the Policy, and not only on the excerpts
cited herein.  Additionally, items which appear in bold font in this letter are fully defined
in the Policy.  Therefore, we ask you to refer to the Policy in its entirety as you review
this letter.  Nothing in this letter is intended to modify the terms of the Policy. To the
extent cited portions differ in any manner from the actual language of the Policy, the
policy language shall control.  Further, inclusion of selected provisions of the Policy does
not in any way intend to limit or waive our right to rely on additional policy terms

The Policy contains two potentially relevant coverages, namely, Coverage B - New
Pollution Incidents At Insured Sites and Coverage E – Off Site Insured Operations
Liability.  The policy defines **Insured Site** as follows:

> **Insured site** means a site described in the Declarations.

The 10551 Decatur Road, Philadelphia, Pennsylvania site is not described as an Insured
Site in the Declarations nor in any endorsement to the policy.  Accordingly, Coverage B
does not apply to this claim.

Materials Processing Corporation
10551 Decatur Road, Philadelphia, Pennsylvania
June 8, 2015
Page 3

The Insuring Agreement for Coverage E provides as follows:

### Coverage E – Off Site Insured Operations Liability

### THE COVERAGE SET FORTH IN SUBPARAGRAPH A. BELOW APPLIES ON A CLAIMS-MADE AND REPORTED BASIS.

Subject to all of the terms and conditions of this insurance:

A.    we will pay:

1.    **damages** that the **insured** becomes legally obligated to pay for **bodily injury** or **property damage**;

2.    **clean up costs** that the **insured** becomes legally obligated to pay; and

3.    related **loss adjustment expenses**;

resulting from a **pollution incident** caused by **off site insured operations**..

This coverage applies only if a **claim** for such **damages** or **clean up costs** is first made against any **insured** and reported to us in writing during the **policy period** or any extended reporting period if applicable.

***

Subparagraphs A. and, B. above apply only if such **off site insured operations** were performed on or after the Off Site Insured Operations Retroactive Date shown in the Declarations.

Subparagraphs A. and B. above do not apply to any damages, loss, cost or expense arising out of any **pollution incident** in connection with any **transported cargo**.

The policy contains the following relevant definitions:

**Claim** means a demand or notice asserting liability or responsibility on the part of the **insured**.

Materials Processing Corporation
10551 Decatur Road, Philadelphia, Pennsylvania
June 8, 2015
Page 4

**Pollution incident** means a discharge, dispersal, seepage, migration, release or escape of:

- **pollutants**; or
- **specific biological substances**;

into or upon land, a structure on land, the atmosphere or groundwater, a watercourse or other body of water.

**Off site insured operations** means the operations or work described in the Declarations that:

- are performed by you on your behalf, and
- take place away from any **insured site**.

The scheduled **off site operations** are described as follows:

Handling and Processing of Computers and Electronics for Recycling

Chubb cannot yet determine whether there is a **claim** for **damages** or **clean up costs** resulting from a **pollution incident** caused by **off site insured operations** based upon the available information. Please advise me of the cause of the contamination. Chubb reserves the right to revisit the issue and assert it as additional grounds to deny coverage.

The Policy contains the following exclusion which precludes coverage for this matter under Coverage E:

**Known Incidents**

This insurance does not apply to any damages, loss, cost or expense arising out of any **environmental incident** known by any **responsible party**, in whole or in part, prior to:

A.   the beginning of the **policy period**, unless such **environmental incident** is disclosed to us by you in the **application**.

B.   as applicable, the time:

   1.   an **insured site**;

Materials Processing Corporation
10551 Decatur Road, Philadelphia, Pennsylvania
June 8, 2015
Page 5

> 2.    a coverage; or
> 3.    an **off site insured operation**;

is added to this policy, unless such **environmental incident** is disclosed to
us by you in writing prior to such time.

The Off Site Insured Operations Liability coverage was added to the policy by way of an
endorsement effective 12/15/14.  The **environmental incident**, if any, was known by
MPC as early as May 29, 2014, which is before Coverage E was endorsed onto the
Policy.  Accordingly, even if the **claim**, if any came within the terms of the insuring
agreement, the above quoted exclusion precludes coverage.

The Policy also contains the following exclusion which may serve as an additional basis
to deny coverage.

> **Damage To Owned, Occupied or Rented Property**
>
> This insurance does not apply to any damages, loss, costs or expense for
> any **property damage** to any property owned or occupied by or leased,
> loaned or rented to any **insured**.
>
> This exclusion does not apply to:
>
> • Coverage E – Off Site Insured Operations Liability, but only with
>   respect to such property owned by your client that is also an **insured**.
>
> • Coverage G – Business Interruption At Insured Sites.

Please advise me of the nature of the relationship between the owner of the Site and
MPC.

## Summary

In summary, Chubb has no duty to defend or indemnify MPC in this matter under policy
3731-30-19 because the loss location is not scheduled to the policy and the known
incident exclusion precludes coverage.

Materials Processing Corporation
10551 Decatur Road, Philadelphia, Pennsylvania
June 8, 2015
Page 6

## **Non-Waiver**

The analysis of coverage outlined herein is not meant to be exhaustive. We reserve the right to re-examine and re-analyze all coverage issues involved and not merely those raised by any additional information or evidence. By limiting policy references to those cited, we do not waive any other policy provisions. We reserve the right to assert additional reasons to disclaim coverage based upon the Policy's terms and conditions or additional facts, whether now known or discovered in the future. The insurance Policy, in its entirety, is incorporated herein by reference as if it had been stated in full.

Our position on coverage is based upon the facts as we know them. We are prepared to reevaluate our position should the claim change and/or if there are any material changes in the allegations or in the facts. If you have any additional information or coverage theories that you believe may have bearing upon our analysis of coverage in this matter, please advise us immediately for our further consideration.

Should you have any questions, my phone number is 412-456-8805, and my e-mail address is *sgoldman@chubb.com*.

> Very truly yours,
> Chubb & Son
> a division of Federal Insurance Company
> Service Provider of Chubb Custom Insurance Company
>
> Scott D. Goldman, Esq.
> Environmental Claim Examiner

cc:    Yazid Ebeid, JD
       HUB International Midwest Limited
       55 E. Jackson Boulevard
       Chicago, Illinois 60604

FLASTER/GREENBERG P.C.
By:    Jeffrey A. Cohen, Esquire
Attorney ID No. 69224
Jeffrey.Cohen@flastergreenberg.com
1810 Chapel Avenue West
Cherry Hill, NJ 08002
*Attorneys for Drummond Decatur and State Properties, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DRUMMOND DECATUR AND STATE PROPERTIES, LLC | Civil Action No.: 2:14-cv-04821-AB |
| *Plaintiff,* | |
| V. | |
| MATERIALS PROCESSING, LLC, SK INTERNATIONAL, INC., TRACE TM L.L.C., DAVID KUTOFF, JOHN DOES 1-99, and ABC CORPORATIONS #1-99 | |
| *Defendants.* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
LEAVE TO AMEND ITS FIRST AMENDED COMPLAINT**

In the event that this Court construes Plaintiff's request as a motion for leave to amend,

Plaintiff Drummond Decatur and State Properties, LLC ("Plaintiff" or "Drummond") submits

this memorandum of law in support of its Motion for Leave to Amend its First Amended

Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), which states that leave to amend

shall be freely given when justice so requires.  S*ee also Foman v. Davis*, 371 U.S. 178, 183

(1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires';

*this mandate is to be heeded*.") (emphasis added).  Consistent with Rule 15(a)'s "liberal"

pleading dictates, "leave to amend must generally be granted unless equitable considerations

5479883 v1

render it otherwise unjust." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 202-203 (3d Cir. 2006)

(reversing the trial court and holding that the plaintiff was entitled to leave to amend his

complaint).

     Leave to amend should be granted in this case because Drummond seeks to amend its

First Amended Complaint to include additional facts related to its existing claims.  Furthermore,

Defendants Materials Processing, LLC ("MPC"), SK International, Inc. ("SK"), David Kutoff

("Kutoff"), John Does #1-99, and ABC Corporations #1-99 (collectively, "Defendants")[1] would

not be prejudiced by an amendment as this request has been made in good faith and without any

undue delay.

## ARGUMENT

     Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party may amend its

pleading with leave of court.  *See* Fed. R. Civ. P. 15(a)(2).  It is well established that "[l]eave to

amend shall be freely given when justice so requires." *Saez v. Gen. Motors Corp.*, 305 Fed.

Appx. 844, 846 (3d Cir. 2009) (quoting Fed. R. Civ. P. 15(a)(2)).  "[A] district court may deny a

request to amend if '(1) the moving party has demonstrated undue delay, bad faith, or dilatory

motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other

part[ies],'" *Juan v. Sanchez*, 339 Fed. Appx. 182, 187 (3d Cir. 2009) (internal citation omitted).

Absent a showing that any of the aforementioned exist, a motion for leave to amend a pleading

should be granted liberally.  *See Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004).  As

demonstrated below, all the above factors weigh in favor of permitting Drummond's proposed

amendment.  Therefore, the Court should grant Plaintiff leave to amend its First Amended

Complaint.

---

[1] As of the date of this filing, parties are negotiating Trace's dismissal from the action without prejudice.  Trace, therefore, is not included in the Second Amended Complaint in anticipation of the filing of the Stipulation of Dismissal.

5479883 v1

## I.      THE AMENDMENT WOULD NOT BE FUTILE

"The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that a particular claim will be decided on the merits rather than on technicalities." *Masimo Corp. v. Philips Electronics North America Corp.*, 2010 WL 1609899, at *1 (D. Del. Apr. 20, 2010) (internal quotation omitted). Here, Drummond seeks to amend its pleading in order to address deficiencies brought to its attention during motion practice. *See Giacalone v. Pennsylvania Insurance Fraud Prevention Authority*, No. 3:11-cv-01647, 2012 WL 629437. at *4 (M.D. Pa. Feb. 27, 2012) (permitting plaintiffs, in response to a defendant's motion to dismiss, to amend their complaint to address deficiencies in their allegations). Drummond's proposed amendments fix any inadequacies in its substantive and jurisdictional allegations and supply sufficient factual content in order to support its claims for relief against all Defendants.[2] Permitting Drummond's amendments, therefore, would not be futile and would allow this case to be decided on its merits and not mere technicalities. *See Masimo Corp.*, 2010 WL 1609899, at *1.

## II.     THE AMENDMENT WOULD NOT PREJUDICE THE DEFENDANTS.

In determining whether amendment would be unjust, the most important factor for a court's consideration is prejudice to the nonmoving party. *See Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) ("[P]rejudice to the nonmoving party is the touchstone for denial of an amendment."). "In the absence of substantial or undue prejudice," denial of leave to amend must be grounded in one or more of the following factors: "bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed, or futility of amendment." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of the Virgin Islands,*

---

[2] Plaintiff's proposed amendments include factual allegations relating to Kutoff's continuous and systemic contacts with the jurisdiction (*see, e.g.,* Second Amended Complaint ¶¶ 28-30) and the Defendants' abuse of the corporate form (*see, e.g.,* Second Amended Complaint ¶¶ 58-66).

5479883 v1

*Inc.*, 663 F.2d 419, 425 (3d Cir. 1981) (affirming trial court's grant of leave to amend to add affirmative defenses). "When opposing amended pleadings on the grounds of prejudice, the non-moving party 'must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely filed.'" *Labware, Inc. v. Thermo Labsystems, Inc.*, 2005 WL 256460, at \*2 (E.D. Pa. Jan. 31, 2005). As Drummond's motion is timely, Defendants cannot show that undue prejudice would result from the amendment of Plaintiff's First Amended Complaint. Plaintiff's First Amended Complaint was only just filed two months ago, and Kutoff's corresponding Motion to Dismiss was filed a mere two weeks ago. Furthermore, the parties have not yet engaged in discovery. Defendants, therefore, cannot claim that they will be unfairly deprived of the opportunity to present facts or evidence relating to their defense. In short, because the most important amendment consideration weighs in favor of Drummond's proposed amendment, the Court should grant its motion for leave to amend.

### III.   DRUMMOND HAS NOT UNDULY DELAYED IN REQUESTING AMENDMENT, NOR IS THE AMENDMENT SOUGHT IN BAD FAITH.

"Delay alone is not sufficient to justify denial of leave to amend." *Arthur*, 434 F.3d at 204. Instead, the non-moving party must demonstrate that the delay was undue in that the passage of time was too extensive or the delay inexplicable. *See id.* (reversing trial court where the plaintiff's delay "was neither so egregious nor unexplained as to warrant refusal of leave to amend"). As discussed above, Drummond's First Amended Complaint, ECF No. 51, was filed on November 18, 2015 and named SK and Kutoff as defendants in this action for the first time. Kutoff's response, ECF No. 63, was filed on January 18, 2016. As of the date of this filing, both MPC and SK have failed to answer Drummond's First Amended Complaint. As Defendants will

4

5479883 v1

not be able to demonstrate undue delay, Drummond's motion for leave to amend should be granted.

## CONCLUSION

For the reasons set forth above, Drummond respectfully requests that this Court grant its Motion for Leave to Amend the First Amended Complaint.

Respectfully submitted,

*/s/ Jeffrey A. Cohen*
Jeffrey A. Cohen, Esquire
FLASTER/GREENBERG, P.C.
Attorney ID No. 69224
Jeffrey.Cohen@flastergreenberg.com
1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900

Dated:  February 1, 2016

5

5479883 v1